UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
───────────────────────────────────────

UNITED POOL DISTRIBUTION, INC.,

                                          Plaintiff,        Case # 22-CV-06314-FPG

v.                                                            DECISION AND ORDER

CUSTOM COURIER SOLUTIONS, INC.,

                                          Defendant.
───────────────────────────────────────

## INTRODUCTION

Plaintiff, United Pool Distribution, Inc. ("Plaintiff" or "United Pool"), filed an amended complaint against Defendant, Custom Courier Solutions, Inc. ("Defendant" or "CCS"), bringing claims for (i) Misappropriation of Trade Secrets under the Defend Trade Secrets Act, (ii) Misappropriation of Trade Secrets under New York Common Law, (iii) Misappropriation of Ideas under New York Common Law, (iv) Misappropriation of Trade Secrets under the Ohio Uniform Trade Secrets Act, (v) Breach of Contract, (vi) Unfair Competition, (vii) Unjust Enrichment, and (viii) Tortious Interference with Prospective Business Relationship. ECF No. 38. Presently before this Court is Plaintiff's motion for partial summary judgment on its breach of contract claim and Defendant's cross-motion for summary judgment with respect to the same claim. ECF Nos. 51, 53. For the following reasons, Plaintiff's motion for partial summary judgment is granted and Defendant's cross-motion for summary judgment is denied with respect to liability for breach of contract. The issue of damages is reserved for trial.

## BACKGROUND

The following facts are undisputed. United Pool is a hauling and trucking operator that serves clients across the United States. ECF No. 38 ¶ 8. It does not own trucks, but rather coordinates between trucking organizations (agents) and organizations in need of logistics

solutions (customers). *Id.* United Pool develops business by consulting with an agent to prepare a bid for a customer's work. *Id.* ¶ 9. To ensure a competitive bid, United Pool divulges confidential information to the agent during the bid preparation process—and therefore requires agents to sign confidentiality, nondisclosure, and noncompetition agreements as consideration for the information. *Id.* ¶ 9-10. In May 2020, Plaintiff reached out to Defendant about a potential customer opportunity with Burlington Coat Factory ("Burlington") in western New York. ECF No. 51-3 at 59. Defendant responded that it was interested in learning more about the opportunity. *Id.* On June 1, 2020, Plaintiff sent Defendant an email asking it to review a draft contract titled "Delivery Agent Non-Disclosure/Non-solicitation Agreement" (the "Agreement") as a condition to providing confidential information about the opportunity with Burlington. ECF No. 51-3 at 58, 63. Defendant responded to that email to make a few changes to the Agreement. *Id.* Plaintiff agreed to those changes, and both parties subsequently signed the Agreement as changed. *Id.* The signed Agreement states that Defendant:

> shall not directly (i) solicit or attempt to solicit any of United Pool's customers that [Defendant] provide[s] service for through it's relationship with United Pool or became first aware of as a result of its relationship or in conjunction with United Pool. Or terminated, interfere with, or otherwise alter current employment, contract, or other business arrangement with United Pool; (ii) enter or attempt to enter into a direct business relationship with any know[n] customer know[n] by [Defendant] to be a United customer, (iii) transport goods or provide any other services for any known United Pool customer (except pursuant to this Contract) …

ECF No. 51-3 at 56 (Agreement ¶ 2). On June 19, 2020, Plaintiff sent an e-mail to Defendant which consisted of pricing and volume information relating to the Burlington opportunity. ECF No. 51-4 at 4-5. On July 31, 2020, Defendant revised its bid proposal based on the information that Plaintiff sent to it. *Id.* at 4. On August 12, 2021, Defendant sent an email directly to a representative of Burlington with background information on Defendant's business for Burlington to review in connection with potentially engaging Defendant directly as a delivery service

2

provider. ECF No. 51-3 at 78. Defendant entered a contract to provide delivery services directly to Burlington on September 10, 2021. *Id.* at 107.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment" if the moving party "shows that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). "Where the moving party demonstrates 'the absence of a genuine issue of material fact,'" *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quoting *Celotex Corp.*, 477 U.S. at 323), "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48 (1986) (emphasis in original). "Only disputes over facts that might affect the outcome of the suit under the governing law" are "material." *Id.* at 248. A dispute about a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In deciding a motion for summary judgment, the Court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility

3

assessments." *Angulo v. Nassau Cnty.*, 89 F. Supp. 3d 541, 548 (E.D.N.Y. 2015) (quoting another source). "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991). Indeed, "[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82–83 (2d Cir. 2004) (citations omitted).

But a "mere scintilla of evidence" in favor of the nonmoving party will not defeat summary judgment. *Anderson*, 477 U.S. at 252. A nonmoving party must do more than cast a "metaphysical doubt" as to the material facts; it must "offer some hard evidence showing that its version of the events is not wholly fanciful." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading....").

## DISCUSSION

Plaintiff moves for partial summary judgment on its breach of contract claim arguing that there is no dispute respecting Defendant's breach of the Agreement. Defendant opposes Plaintiff's motion by arguing that the restrictive covenant not to compete is unenforceable and also that Plaintiff cannot establish that a contract was breached. *See generally* ECF No. 53. The Court will first address the enforceability of the restrictive covenant followed by an analysis of Plaintiff's breach of contract claim.

I. **Enforceability of Restrictive Covenant**

"Under New York law,[1] the enforceability of a restrictive covenant depends in part upon the nature of the underlying contract." *DAR & Assocs., Inc. v. Uniforce Servs., Inc.*, 37 F. Supp. 2d 192, 196 (E.D.N.Y. 1999). In the context of ordinary commercial contracts, such as non-disclosure/non-solicitation agreements, courts apply "a simple rule of reason, balancing the competing public policies in favor of robust competition and freedom to contract." *Id.* at 197. The rule of reason consists of three factors. First, courts consider whether there is a "legitimate business interest that warrants the enforcement of the restrictive covenants." *Id.* Second, courts examine the "reasonableness of the covenants with respect to geographic scope and temporal duration." *Id.* Finally, courts analyze the degree of hardship that enforcing these covenants would inflict upon Defendant, bearing in mind the degree to which Defendant consciously agreed to bear the risk of such hardship when it entered into the Agreement with Plaintiff. *Id.*

A. Legitimate Business Interest

Plaintiff has a legitimate business interest in preventing unfair competition. According to United Pool, the noncompete clause is intended to prevent the agents that it works with from usurping business opportunities that it presents to them. ECF No. 51-1 at 15. This is consistent with the contract language which prohibits CCS from "(ii) enter[ing] or attempt[ing] to enter into a direct business relationship with any know[n] customer" and "(iii) transport[ing] goods or provid[ing] any other services for any known United Pool Customer (except pursuant to this Contract)[.]" ECF No. 1-1 at 2. Because of the relationships that it has with clients, United Pool

---

[1] Federal courts sitting in diversity must apply the choice of law rules of the forum state to determine the substantive law governing a dispute. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 495–96 (1941). New York courts infer that the parties have agreed to apply the law of the forum state in the absence of a choice of law provision and when the parties do not dispute the application of the law of the forum state. *See Felice Fedder Oriental Art, Inc. v. Scanlon*, 708 F. Supp. 551, 553 (S.D.N.Y. 1989) ("[S]ince neither party has raised any choice of law issues, it can be said that they have consented to the application of the forum state's law.). Here, the contract did not contain a choice of law provision and the parties have not objected to the application of New York law. Therefore, New York substantive law applies.

5

has access to information that other providers in the market do not have. Therefore, when it shares that information with agents, those agents could use that information to compete directly with United Pool and usurp the same business opportunities that it presents to those agents.

On the other hand, Defendant argues that there is no legitimate business interest because Plaintiff cannot establish a causal link between the information Plaintiff shared with it and the breach. ECF No. 53-14 at 15; *see also Calico Cottage, Inc. v. TNB, Inc.*, No. 11-CV-0336 DLI MDG, 2014 WL 4828774, at *8 (E.D.N.Y. Sept. 29, 2014) (stating that the "undisputed facts . . . do not resolve the causation issue as to how the information shared by Plaintiff plausibly allowed Defendant to unfairly compete"). Defendant argues that it began servicing the Burlington account not because of any information it received from Plaintiff but because it entered into an asset purchase agreement ("Asset Purchase Agreement") with a different company named U.S. Logistics pursuant to which it obtained the rights to service Burlington through the contract that U.S. Logistics had with Burlington. ECF No. 53-14 at 16; ECF No. 51-3 at 69-77 (The Asset Purchase Agreement). Although it is true that Defendant purchased the assets of U.S. Logistics, the assets of that company did not include its contract with Burlington. ECF No. 51-3 at 70, 75; APA § 2. Rather, the agreement contemplated Defendant becoming a subcontractor for the Burlington account, and also required that it be independently approved by Burlington by a certain date. *See* Asset Purchase Agreement § 5(a), (b). This is not materially different than the arrangement that was contemplated with United Pool. Moreover, because United Pool had already shared information regarding pricing as well as weight and number of boxes to be shipped, which was necessary for constructing a compelling proposal, it is plausible that the information it obtained from United Pool facilitated its ability to successfully subcontract in place of U.S. Logistics following the execution of the Asset Purchase Agreement.

Therefore, unlike *Calico Cottage*, the Court finds that the undisputed facts suggest that the information shared could have Defendant to unfairly compete. Rather, this case is more like *Express Freight*, where the court found that the plaintiff had a legitimate business interest in protecting its position as an intermediary in the marketplace. *See Express Freight Sys. Inc. v. YMB Enterprises Inc.*, 623 F. Supp. 3d 39, 51–52 (E.D.N.Y. 2022) ("[B]enefit[ing] from its contract with [plaintiff] and from [plaintiff]'s role as an intermediary while undercutting [plaintiff]'s business with [end customer] would indeed amount to unfair competition."). By purchasing assets from U.S. Logistics and servicing its Burlington account as a subcontractor, it is plausible that Defendant could use the information it received from United Pool to persuade U.S. Logistics that it could successfully service the Burlington account. Because it is plausible that the confidential information could help Defendant to unfairly compete, the causation issue with respect to that information is resolved. Accordingly, the Court concludes that Plaintiff had a legitimate business interest to protect with the covenant not to compete.

### B. Reasonableness

Defendant argues that the contract is not reasonable because "there is no geographic restriction" in the written document. ECF No. 53-14 at 14. Defendant also contends that there is "no term or time restriction" because the contract is missing a termination provision. *Id.* Both of these arguments are unavailing, and therefore, the Court finds that the covenant is reasonable with respect to its geographic scope and temporal duration.

Defendant's argument that "there is no geographic restriction," is another way of stating that the restrictive covenant applies everywhere. This is in contrast to Plaintiff's implied argument that the restrictive covenant applies only to Western New York. Based on the circumstances surrounding the contract's execution, the Court determines that both interpretations are reasonable.

7

Because the absence of a provision specifying the exact geographic scope of the restrictive covenant makes the contract reasonably susceptible to two interpretations on this issue, the Court concludes that the contract is ambiguous with respect to the geographic scope of the restrictive covenant. *See Korosh v. Korosh*, 99 A.D.3d 909, 911 (2nd Dep't 2012) (stating that "a writing is ambiguous is a matter of law" where the Court determines that "the agreement on its face is reasonably susceptible of more than one interpretation."). When interpreting a contract provision that is ambiguous, the Court may look to extrinsic evidence to resolve the ambiguity. *See Baez v. New York City Hous. Auth.*, 533 F. Supp. 3d 135, 142 (S.D.N.Y. 2021) (stating that "extrinsic evidence of the parties' intent may . . . be considered where an agreement is ambiguous"). Accordingly, the Court has looked to contemporaneous emails sent between the parties to determine the intended geographic scope of the restrictive covenant.

In an email written by Chris Mackrell, Defendant's President and C.O.O., on June 18, 2020 he said, "we reviewed our previous proposal for Burlington in upstate NY." ECF No. 51-4 at 5. Later, when discussions were still ongoing in November of 2020, Lloyd Sprockett sent an email referring to "the likelihood of continuing pool operations in the WNY market." ECF No 51-4 at 3. These writings demonstrate that the parties intended their business arrangement to apply to Western New York. Therefore, the Court interprets the contract as incorporating a geographic limitation confined to western New York. With such a geographic limitation, the Court finds that it is reasonable.

Likewise, the temporal limitation is also reasonable as it only restricts Defendant for a period of one year following contract termination. *See BP Prods. N. Am. Inc. v. Motor Parkway Amoco*, No. CV-06-0833 (SJF), 2006 WL 6928862, at *4 (E.D.N.Y. Aug. 21, 2006) ("[T]he five-year duration of the term at issue is reasonable considering that [it] was an arm's length transaction between sophisticated businesspeople."); *Express Freight*, 623 F. Supp. 3d at 52 (concluding that

"two years following the termination of the Contract . . . was reasonable"). While the contract does not specify the date of contract termination, the Court determines that the contract has a one-year term. *See* Section II.A.3., *infra*. Therefore, the temporal limitation is reasonable.

C. **Hardship**

Finally, the Court does not find that enforcing the contract would impose any hardship on CCS. Defendant says that enforcement of the provision would subject it to hardship because it would prohibit it "from ever providing delivery and logistics services to Burlington." ECF No. 15-16. The Court is not convinced by Defendant's construction of its hardship. First, contrary to Defendant's contention, the restrictive covenant does not endure indefinitely. It only lasts for one year after contract termination. Second, Defendant was consciously aware of the burden that it was undertaking when it entered into the Agreement.

This "commercial contract was the result of 'an arm's length transaction between sophisticated businesspeople.'" *Express Freight*, 623 F. Supp. 3d at 53 (quoting *BP Prods.*, 2006 WL 6928862, at *4 (E.D.N.Y. Aug. 21, 2006)). Defendant does not "not contend that [it was] coerced into agreeing to the restrictive covenant in the [Contract], or that [it] lacked any meaningful choice with regard to accepting it." *Id.* at 52. In fact, the evidence suggests that Defendant knew exactly what it was doing when it signed the agreement because when United Pool approached it on a later occasion with respect to a different opportunity for a different United Pool customer, Defendant declined to sign the new non-solicitation agreement, stating that it was approached by a different contractor for that same opportunity and had already received confidential information from that other contractor. ECF No. 51-3 at 66. Defendant, therefore, knew what it meant to sign the Agreement and opted not to commit itself to that obligation respecting a different customer.

9

Moreover, Defendant negotiated this contract and the provision regarding the noncompete specifically. CCS had the opportunity to prospectively negotiate the contract to avoid causing a breach under these circumstances. However, its choice not to undertake those negotiations does not create an unreasonable hardship retrospectively.

In view of the foregoing, the Court finds that Plaintiff has a legitimate business interest in the restrictive covenant, that the covenant is reasonable in geographic and temporal scope, and that Defendant will not suffer any hardship if it is enforced. Accordingly, the Court finds that the restrictive covenant not to compete is enforceable.

## II. Breach of Contract

"To state a claim for breach of contract under New York law, the complaint must allege: (i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 114 (2d Cir. 2017) (cleaned up). As to the first element, "[i]t is well settled that a contract must be definite in its material terms in order to be enforceable." *Clifford R. Gray, Inc. v. LeChase Constr. Servs.*, LLC, 31 A.D.3d 983, 985 (3d Dep't 2006) (citation omitted). This requirement is satisfied where there is "an objective method for supplying a missing term." *Id.* at 986 (citation omitted).

### A. Contract Formation

"To establish the existence of an enforceable agreement, a plaintiff must establish an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound." *Kowalchuk v. Stroup*, 61 A.D.3d 118, 121 (2009). The Court finds that all elements are satisfied here.

#### 1. Offer and Acceptance

On June 1, 2020, United Pool sent CCS a proposed nondisclosure/noncompetition agreement inviting CCS to "return a signed copy" if it agreed with the terms. ECF No. 51-3 at 63. Later that same day, CCS responded with a few revisions to the agreement, constituting a counter-offer. *Id.* United Pool agreed to the revisions stating, "I have no issue with the revision; serves same intent." *Id.* Both parties then executed the agreement as revised by CCS on June 1, 2020. *Id.* at 62; 56-57. Accordingly, there is no genuine dispute that there was a valid offer, counter-offer and acceptance by both parties.

2. **Consideration**

"Consideration consists of either a benefit to the promisor or a detriment to the promisee. It is enough that something is promised, done, forborne, or suffered by the party to whom the promise is made as consideration for the promise made to him [or her]." *Dee v. Rakower*, 112 A.D.3d 204, 210 (2nd Dep't 2013) (quoting *Anand v. Wilson*, 32 A.D.3d 808, 809 (2nd Dep't 2006)).

Defendant contends that "United Pool did not provide anything of 'real value' to Customer Courier, let alone anything at all." ECF No. 53-14 at 12. As an initial matter, Defendant's assertion is inaccurate as United Pool promised to provide confidential information to CCS as consideration for CCS's promise to avoid soliciting or serving United Pool's customers, including Burlington. *See* ECF No. 51-3 at 63 (stating that "we will then start providing you with information in regard to the potential Burlington Stores opportunity" once CCS agreed to the terms of the Agreement). Moreover, Defendant's assertion is based on an incorrect assumption about the law. The law does not require "the detriment suffered [by promisor] or the thing promised [to] be of [any] benefit to the one who agreed to it." *Weiner v. McGraw-Hill, Inc.*, 57 N.Y.2d 458, 464 (1982). Defendant

11

has, therefore, failed to show that there is a genuine dispute respecting consideration in the Agreement. Accordingly, the contract was supported by consideration.

### 3. Mutual Assent

It is axiomatic that "[t]o create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Matter of Express Indus. & Term. Corp. v. New York State Dept. of Transp.*, 93 N.Y.2d 584, 589 (1999). Generally, courts "look to the basic elements of the offer and the acceptance to determine whether there is an objective meeting of the minds sufficient to give rise to a binding and enforceable contract." *Id.*

Defendant contends that there was no mutual assent or meeting of the minds because "the alleged contract is vague, poorly drafted, and lacks essential terms." ECF No. 53-14 at 13. Specifically, Defendant asserts that "there is no termination provision." *Id.* According to Defendant, absent a termination provision and an express method for determining the duration of the term of the contract, there can be no mutual assent. *Id.* However, "the mere fact that [a] confidentiality agreement [is] not limited in duration does not necessarily make [it] ipso facto unenforceable." *Trump v. Trump*, 192 N.Y.S.3d 891, 902 (N.Y. Sup. Ct. 2023), *aff'd*, No. 2023–03021, 2024 WL 2752004 (1st Dep't 2024). Rather, "the essential part of [confidentiality] agreements is not their duration but the prohibition against using confidential information." *Id.* In other words, the duration of a confidentiality agreement is not so material a term as to render the contract unenforceable if it is not definitively defined in the agreement itself. This same logic holds true in the context of noncompetition agreements as well. *See Ashland Management Inc. v. Altair Investments NA, LLC*, 869 N.Y.S.2d 465, 471 (1st Dep't 2008).

Here, as in *Trump* and *Ashland Management*, the material terms of the agreement at issue are the confidentiality and non-solicitation provisions. Defendant has not identified any portion of those provisions that is so vague as to render the agreement unenforceable. Rather, there is no dispute that those terms clearly prohibit Defendant from soliciting any of Plaintiff's customers in Western New York during the term of the agreement. There is no genuine dispute that the parties mutually assented to the contract.

Moreover, in cases where the agreement does not have a definitive expiration term, "courts have the authority to find an unlimited duration to be overbroad." *Id.* The proper remedy in such circumstances is to "modify the agreements' duration to one more reasonable under the circumstances." *Id.* Under the circumstances of this agreement, the Court finds that a term of one year is a reasonable duration. In the email that Mr. Sprockett wrote to Mr. Mackrell indicating that there was a potential opportunity with Burlington and inviting him to execute the non-solicitation agreement, he stated that it "may not come to fruition until after the first of the year." ECF No. 51-3 at 63. This was "due to the temporary shutdown associated with the pandemic." *Id.* Therefore, at the time of entering the contract, both parties were aware that the opportunity for which they were committing themselves to work together under the terms of the agreement would not materialize for at least seven months following the date that they executed the agreement. They also knew that the term's duration was not arbitrary, but the result of the effects of the pandemic response. Considering the circumstances surrounding the execution of the agreement, the Court finds that a reasonable term of the agreement is one year.

### 4. Intent to be Bound

The Court also finds that the parties intended to be bound by the agreement. On August 31, 2020, at least two months after initially signing the non-solicitation agreement, CCS demonstrated

13

a reaffirmation of its intent to be bound by stating "per our agreement we have not engaged any other customers or individuals in relation to the Burlington account." ECF No. 51-3 at 66. This email indicates that it knew that after signing the non-solicitation agreement on June 1, 2020 it was prohibited from engaging with any other contractors regarding the opportunity with Burlington.

The Court, therefore, finds that the parties formed an enforceable contract because there was an offer, counter-offer, acceptance of the counter-offer, consideration, mutual assent and intent to be bound.

### B. Plaintiff's Performance

Defendant argues that United Pool did not perform under the contract because "it did not provide any new information, let alone any confidential information, to Custom Courier after June 1, 2020." However, the record demonstrates otherwise. Via email dated June 19, 2020 from Mr. Sprockett to Mr. Mackrell, United Pool provided CCS proposed carton assessment and carton weight costs for inclusion in the Burlington bid. *See* ECF No. 51-7 at 2. CCS does not address this email in its reply, but only makes that conclusory assertion that United Pool did not perform. Defendant's conclusory assertion that United Pool did not perform is not sufficient to create a genuine dispute regarding United Pool's performance in light of the email evidence to the contrary. The Court, therefore, finds that no reasonable juror could conclude that Plaintiff did not perform under the contract.

### C. Breach

In an email dated August 12, 2021, CCS directly provided background information on CCS to a representative of Burlington with the expressed intent to assist Burlington in its decision of whether to hire CCS to provide delivery services for it. ECF No. 51-3 at 78. The non-solicitation

agreement prohibits CCS from "directly (i) solicit[ing] or attempt[ing] to solicity any of United Pool's Customers." ECF No. 51-3 at 56. The e-mail from Mr. Mackrell to Burlington's representative constitutes a direct solicitation.

Since the Court has already determined that the term of the contract was one year, *see* Section II.A.3., *supra*, the contract would have terminated on June 1, 2021. By the terms of the contract, the non-solicitation provisions of the contract extended for one more year after termination. Therefore, as of August 12, 2021, CCS was still under the obligation not to solicit Burlington because it had committed to do so through United Pool. Therefore, by sending this direct solicitation email, breached the non-solicitation provision of the contract on that date.

Defendant attempts to argue that the breach is excused because its solicitation to Burlington was facilitated by an agreement it made after entering into the Asset Purchase Agreement. ECF No. 53-14 at 13. This argument is unavailing because the non-solicitation provision does not condition a breach on whether CCS entered into an Asset Purchase Agreement only that CCS solicited Burlington directly, which the record shows that CCS did do.

Defendant also breached the agreement by "provid[ing] delivery and logistics services to Burlington." ECF No. 53-14 at13. Defendant even admits this in its answer and in its brief. *Id.*; ECF No. 39 ¶ 32.

### D. Damage

"Proof of damages is an essential element of a claim for breach of contract under New York law." *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 141 (2d Cir. 2016). However, "New York courts do not require scientific rigor in the calculation of damages." *Lexington Prods. Ltd. v. B.D. Commc'ns, Inc.*, 677 F.2d 251, 253 (2d Cir.1982). Rather,

> [w]hen it is certain that damages have been caused by a breach of contract, and the only uncertainty is as to their amount, there can rarely be any good reason for

refusing, on account of such uncertainty, any damages whatever for the breach. A person violating his contract should not be permitted entirely to escape liability because the amount of the damage which he had caused is uncertain.

*Id.* (quoting *Randall–Smith, Inc. v. 43d St. Estates Corp.*, 17 N.Y.2d 99, 106 (1966)).

Plaintiff argues that it has proven that it has been damaged because the non-solicitation agreement provides that "any breach or attempted breach would cause irreparable injury." ECF No. 51-3 at 60. This contract language is sufficient to prove the fact of damages. The burden is on the wrongdoer to demonstrate the uncertainty as to the amount of damages. See *Tractebel Energy Marketing, Inc. v. AEP Power Marketing*, Inc., 487 F.3d 89, 110-11 (2d Cir.2007). Even if the actual amount of damages could be reasonably determined with certainty, "[n]ominal damages are always available in breach of contract actions." *Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90, 95 (1993). Plaintiff has, therefore, demonstrated that there is no genuine dispute as to the fact of damages in its breach of contract claim. The amount of damages resulting from Defendant's breach is reserved for a hearing or trial.

## CONCLUSION

Plaintiff's motion for partial summary judgment respecting liability on its breach of contract claim is GRANTED. The issue of the amount of damages is reserved for trial. Defendant's cross-motion for summary judgment on the breach of contract claim is DENIED.

IT IS SO ORDERED.

Dated: June 25, 2024
      Rochester, New York

_____
HON. FRANK P. GERACI, JR.
United States District Court
Western District of New York